**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
Alexandria Division

| | |
|---|---|
| **IN RE: ESTATE OF LARRY W. COOK,** </br>       **Deceased** </br> _____ </br> **JANINE SATTERFIELD, in Her Capacity as** </br> **Administrator for the Estate of Larry W. Cook,** </br> **Deceased,** </br>       **Plaintiff,** </br> v. </br> **WELLS FARGO BANK, N.A.,** *et al.***,** </br>       **Defendants.** </br> _____ | ) </br> ) </br> ) </br> ) </br> ) </br> ) Case No. 1:23 – cv-00009 CMH/LRV </br> ) </br> ) </br> ) </br> ) </br> ) </br> ) </br> ) </br> ) </br> ) </br> ) |

**AMENDED COMPLAINT**

**COMES NOW** Plaintiff, JANINE SATTERFIELD, in her capacity as the Administrator of the Estate of Larry W. Cook[1], by and through counsel, and in support of her Amended Complaint, being filed herein pursuant to Fed. R. Civ. Pro. 15, respectfully states as follows:

**THE PARTIES**

1.  Larry W. Cook (hereinafter "Mr. Cook") died intestate on April 21, 2021, a resident of Fairfax County, Virginia.

2.  Esther J. Murphy was Mr. Cook's mother, who predeceased him.

3.  At the time of his passing, Mr. Cook was the acting Trustee, and a beneficiary, of the Esther J. Murphy Trust (hereinafter "EJM Trust"). A copy of said EJM Trust is attached hereto

---

[1] The original Complaint states that Janine Satterfield had filed this case Individually and in her capacity as the Administrator, of the Estate of Larry W. Cook. Janine Satterfield acknowledges that she lacks standing to bring this action individually. This Amended Complaint reflects that she is only proceeding in her capacity as Administrator of the Estate of Larry W. Cook.

and incorporated herein as **Exhibit 1**.

4. Janine Satterfield (hereinafter "Ms. Satterfield" or "Administrator") is Mr. Cook's niece, and on June 14, 2021, qualified as the Administrator of his estate. A copy of Ms. Satterfield's Certificate of Qualification is attached hereto and incorporated herein as **Exhibit 2**.

5. Navy Federal Credit Union (hereinafter "NFCU") was one of two banks that Mr. Cook held a savings and checking account at and was the bank that allowed Mr. Cook to wire out, approximately, seventy-four (74) international wire transfers for a total amount of approximately $3,631,200.00 dollars to individuals maintaining accounts with the Bangkok Bank aka Bank of Bangkok and Standard Chartered[2]. In addition, Mr. Cook incurred $1,850 in wire transfers fees, at the rate of $25.00 per each wire transfer, with NFCU.

6. Navy Federal Credit Union's principal place of business is 820 Follin Lane, S.E., Vienna, Virginia 22180.

7. Wells Fargo Bank, N.A.[3] (hereinafter "Wells Fargo") is the bank that NFCU uses as the intermediary or correspondent bank for sending out all international wire transactions.

8. Additionally, Wells Fargo was the other primary bank in which Mr. Cook held a checking and savings account, and the bank that allowed Mr. Cook to send out one (1) international wire to Bangkok Bank in the amount of $49,500.00.

9. Wells Fargo has its principal office located in Sioux Falls, South Dakota, but has numerous branches of the bank located in and around the Commonwealth of Virginia.

---

[2] Based on records produced by NFCU in response to subpoenas *duces tecum* issued by Plaintiff, two of the wire transfers appear to have been sent to accounts held with Standard Chartered. The remaining wire transfers went to accounts held with Bangkok Bank.

[3] The original Complaint incorrectly referenced Wells Fargo & Company in the case header. This Amended Complaint corrects that error. Paragraph 7 of the original Complaint correctly referenced Wells Fargo Bank, N.A., as does this Amended Complaint.

## JURISDICTION AND VENUE

10. This case was removed to this Court by NFCU. This Court has jurisdiction over this matter pursuant to 12 U.S.C. § 632, and 28 U.S.C. § 1331.

11. Venue is proper in the United States District Court for the Eastern District of Virginia, Alexandria Division, pursuant to 28 U.S.C. § 1441 as the case was removed from the Circuit Court of Fairfax County.

## STATEMENT OF FACTS

12. On April 21, 2021, Mr. Cook passed away at the age of seventy-six (76) years old.

13. Prior to his death, Mr. Cook was a -highly decorated Navy Veteran having served this country for over twenty-four years, with an additional twenty years of service in the private sector for government contracts, to wit:

    a. He was educated for one year at Edison Technical School in Seattle, Washington before enrolling at the University of Washington, earning his Bachelor of Science degree in 1968.  He was retired as a Commander in 1992, after having served since 1968.

    b. He was commissioned as an officer in the U.S. Navy on June 24, 1968.

    c. He then went to the Navy Nuclear Power School for one year, and then Submarine School through the U.S. Navy

    d. He received during his years of military service, *inter alia*, the Meritorious Service Medal with one gold star, Navy Commendation Medal with one gold star, Navy Achievement Medal with one gold star, Meritorious Unit Commendation with one bronze star, Navy Expeditionary Medal, and Sea Service Deployment Ribbon with three bronze

service stars.

  e. He was a submarine officer, with nuclear submarines being his primary focus.

  f. He was employed with Booz Allen Hamilton from March 15, 1993, until such time as he secured employment with Zimmerman Associates, Inc.  Both companies employed him for his experience with the U.S. Navy.  A copy of one of Mr. Cook's many printed resumes is attached hereto and incorporated herein as **Exhibit 3**.

14. From a cognitive perspective, Mr. Cook was highly intelligent and managed his affairs, including his finances, very well before his health declined, due to a stroke in 2019.

15. NFCU knew Mr. Cook's rank and grade with the U.S. Navy.

16. He had an estimated net worth of approximately $8 million to $10 million dollars.

17. Additionally, prior to his death, Mr. Cook was the Trustee, and a beneficiary, of the EJM Trust which had an approximate value of about $2 million dollars.

18. As a trustee and beneficiary of the Trust, Mr. Cook had responsibilities to pay his mother's debts and taxes, and to use the funds pursuant to the terms of the EJM Trust.

19. There was never any doubt as to Mr. Cook's fitness for the role of trustee for his mother, given his years of military service and his overall aptitude.

20. During his lifetime, Mr. Cook only used two primary banks to house his accounts, which were NFCU and Wells Fargo.

21. Mr. Cook was also managing two of his own rental properties in Washington State, and those accounts were held with the same banks.

22. Mr. Cook first opened accounts with both institutions in the 1970's and held a checking and saving account with both.

23. His banking history with both financial institutions is such that he was not conducting business using wire transfers to foreign banks. He was a very conservative spender and would not spend money until necessary.

24. Mr. Cook was never married, and he had no children.

25. His sibling predeceased him, and his mother died in Santa Clara, California (almost three thousand miles away) on February 5, 2019, at age 101 years.

26. Prior to her death, Mr. Cook had been managing her assets, long distance, but there came a time when his diligence in management started declining.

27. Mr. Cook was a meticulous record keeper. He retained records for a number of different events and kept records of all of his tax returns.

28. However, all of that stopped when he suffered an acute stroke on or around July 15, 2019.

29. He awoke at home with impaired coordination. He did not seek medical help for over fourteen hours, which made him ineligible for aggressive anti-clot therapy on arrival to hospital, depriving him of opportunity to minimize his neurologic deficits.

30. In fact, Mr. Cook had attempted to drive himself to his primary care physician, but had a minor motor vehicle accident on the way.

31. Mr. Cook was discharged to in-patient rehabilitation where the full extent of his cognitive deficits were observed. He had poor insight into his condition, lacked insight into his deficits, although very concerned about being able to go back to work as a consultant for the Navy. He had no family support and was very anxious to be cleared to drive.

32. The right hemisphere stroke in July 2019 left him with left sided weakness and impaired sensation, impaired coordination and unstable gait, facial droop, and cognitive

impairment including emotional lability, impulsiveness, impaired judgment, and impaired insight with denial, all making him highly vulnerable to undue influence and financial exploitation and impaired his capacity to make reasoned and rational judgments or decisions regarding his personal health and management of his finances.

33. Mr. Cook did nothing to administer the EJM Trust on and after his stroke, and became unresponsive to the beneficiaries and others.

34. By June 2020, Mr. Cook was forced to retire, since he was no longer capable of working to the level he had been.

35. Mr. Cook's social isolation more likely than not exacerbated his vulnerability to undue influence and financial exploitation.

36. The cognitive deficits produced by the July 2019 stroke were unlikely to significantly improve over time, and certainly left him highly vulnerable to undue influence and financial exploitation.

37. Subsequent to his stroke, Mr. Cook stopped filing his personal income tax returns.

38. Mr. Cook failed to file tax returns for his mother and the EJM Trust.

39. However, Mr. Cook did manage to transfer approximately $1 million from the EJM Trust to his personal accounts during the time he was being financially exploited, as more fully set forth in the paragraphs following.

40. Mr. Cook also stopped assisting with the attorney handling the administration of the EJM Trust, which was uncharacteristic of him.

41. Mr. Cook was not in the best of health, having previously suffered a myocardial infarction, Type II Diabetes, Hypertension, Hyperlipidaemia, Gout and Obesity.

42. On October 5, 2020, Mr. Cook received an unsolicited email from, what appeared,

the company "Amazon", informing him of his recent purchase of an iPad and even providing instructions for whom to call with questions regarding this recent purchase. A copy of said email is attached hereto and incorporated herein as **Exhibit 4.**

43. Unbeknownst to Mr. Cook, he was falling prey to a very elaborate, and fraudulent, scam, a scam which NFCU later warned its customers about in a December 3, 2020, customer alert titled "Fake calls from Apple and Amazon support: What you need to know", a copy of which is attached hereto and incorporated herein as **Exhibit 5**.

44. Given his medical status, his social isolation and enfeebled state, Mr. Cook was without capacity to manage his finances, and he was susceptible to financial exploitation and needed the protection of a conservator.

45. On October 6, 2020, after receipt of the fraudulent email, Mr. Cook sent out the first wire, from his NFCU checking account to a stated individual with an account at Standard Chartered in Singapore. This wire was made in person at the Vienna, Virginia NFCU branch.

46. Also on October 6, 2020, Mr. Cook contacted NFCU to check his checking account balance, stating, "We're moving money around due to an infraudulent [sic] charge on another system, and I need to validate what the current balance is."

47. It is clear he was not necessarily using appropriate language to describe the "fraudulent" activity.

48. Nonetheless, NFCU was immediately on notice of some sort of fraudulent activity associated with Mr. Cook.

49. The balance in his checking account on that day was $612,451.34.

50. Between the time period of October 6, 2020, through April 20, 2021, a day before his death, Mr. Cook sent out a total of seventy-five (75) international wire transfers, to stated

individuals holding accounts with Standard Chartered and the Bank of Bangkok, for a grand total of $3,680,700.

51. Nearly all of the wire transfers were in the amount of $49,500.00, to, what appears to be a fictious name and address, and stated that the purpose was for a "Loan Repayment." Copies of the wire transfer receipts are attached hereto and incorporated herein as **Exhibit 6**.[4]

52. A total of seventy-five (75) international wires were sent, seventy-four (74) of the wires were sent by Navy Federal Credit Union ("NFCU") and only one (1) was, successfully, sent through Wells Fargo.

53. Having been an account holder since the 1970's, both NFCU and Wells Fargo have, or should have, a long history of Mr. Cook's daily transactions, and standard purchases and should have seen that, prior to October 6, 2020, Mr. Cook had never previously sent any international or domestic wire.

54. On November 3, 2020, after sending out approximately fifteen (15) wires and basically liquidating his NFCU checking account, Mr. Cook went to Wells Fargo where he sent out one (1) international wire from his Wells Fargo checking account to the Bank of Bangkok.

55. Sometime between November 3, 2020, and November 6, 2020, Mr. Cook attempted to send a second international wire at Wells Fargo using his Wells Fargo checking account. However, he was denied and ultimately ended up sending a domestic wire transfer from Wells Fargo to his NFCU checking account. A copy of these transactions are attached hereto and incorporated herein as **Exhibit 7**.

56. The exact reason that Wells Fargo denied Mr. Cook's international wire request is unknown.

---

[4] All personal identifying information has been redacted.

57. On November 10, 2020, just five (5) days after Wells Fargo denied his wire request, Mr. Cook was able to successfully send this same wire, and sixty-one (61) subsequent wires, by going to NFCU, which uses Wells Fargo as the intermediary bank to process its wires.

58. On December 15, 2020, after, approximately, twenty-eight (28) wires had been sent out, NFCU representative, Robert Izzo, reported Mr. Cook to Fairfax County Adult Protective Services (APS), for what was detailed as "incoming wires and outgoing wires were conducted in a manner indicative of possible elder financial exploitation." A copy of the APS report is attached hereto and incorporated herein as **Exhibit 8.**

59. In fact, the report reflects the following information:

   a. "Between 10/06/2020 and 12/11/2020, incoming wires and outgoing wires were conducted in a manner indicative of possible elder financial exploitation, totaling $2,343,700. The incoming wires which totaled $1,039,000, along with Mr. Cook`s direct deposits from ALAC-OPEN, DFAS-CLEVELAND RET NET, SSA TREAS and ZIMMERMAN ASSOCIATES, sourced outgoing wire activity which totaled $1,304.700. **The member has no history of such activity**." (Exhibit 8 at 2; emphasis added.)

   b. "The reason for the outgoing wires was LOAN REPAYMENT. According to numerous notes in our back office system, the member has been warned numerous times that he is the victim of a scam, but he still wants to proceed with the wires. He appears to be mentally competent. Other account activity for the member reflects seemingly normal transactions and bill payments." (Exhibit 8 at 2.)

   c. "APS communicated to Mr. Cook`s bank that there was a risk for financial exploitation and **asked that his accounts continued to be monitored**." (Exhibit 8 at 8.)

60. Part of the funds received into Mr. Cook's NFCU account came from Chase Bank,

being accounts held and titled in the EJM Trust.

61. Prior to this report, it appears that NFCU never questioned, reported, or even attempted to stop any of Mr. Cook's international wires and instead, even after the APS Report was made, continued to process at least another forty-two (42) wires.

62. The tortious conduct by NFCU was continuous over the incredibly brief period of time, ceasing only because of Mr. Cook's death.

63. While NFCU contended it had "numerous notes" in its back-office system, when Administrator subpoenaed NFCU's records through a court-ordered expansion of powers, none of these "notes" were ever produced. *See* Court Order – Expansion of Powers, attached hereto and incorporated herein as **Exhibit 9**.

64. Additionally, in the APS report investigation, the section titled Risk of Harm, it is stated that, "APS learned that wire transfers continued to occur after the referral had been received. The risk for financial exploitation is high." *See* Exhibit 8.

65. Upon completion of the investigation, APS sent a letter to NFCU, Robert Izzo, dated January 28, 2021, which stated, in relevant part, "[t]he investigation has been completed, and at this time, Mr. Cook is in need of protective services. Available and appropriate services will be offered." See copy of said correspondence attached hereto and incorporated herein as **Exhibit 10**.

66. At no such time, before, during or after, making a report to APS, did NFCU stop wiring the money out.

67. In fact, on or about February 1, 2021, NFCU called Mr. Cook to inquire further about the wire transfers. Mr. Cook's notes state that NFCU reported a "Red Flag on the receiving end" in addition to asking him further questions about the wire transfers. Nevertheless, NFCU sent

Mr. Cook documents to continue the wire transfers and continue to process his requests, despite have a reason to suspect that something improper was happening. A copy of Mr. Cook's February 1, 2021 notes is attached hereto and incorporated herein as **Exhibit 11**.

68. At no time since the completion of the investigation and notification by APS that Mr. Cook was in need of protective services did NFCU attempt to intervene or halt the wire transfers.

69. NFCU was negligent in allowing Mr. Cook to make these irregular and fraudulent wire transfers, having been put on notice of fraudulent activity, and having assumed a duty by reporting him to APS.

70. NFCU failed to monitor Mr. Cook's account for suspicious, irregular, fraudulent, and /or unauthorized activity.

71. NFCU failed to timely recognize that the wire transfers were suspicious, irregular and fraudulent, as detailed herein.

72. By reporting the situation to APS, NFCU assumed a duty with respect to Mr. Cook.

73. By state law, they had every ability to shut down the account, and/or to bring a conservatorship action to intercede on Mr. Cook's behalf, even if he had protested.

74. NFCU failed to protect Mr. Cook's funds by timely terminating or suspending wire transfers and/or freezing his account or taking any other reasonable step to halt, including after it had alerted Mr. Cook that the transactions were likely related to a fraudulent scheme.

75. NFCU failed to reasonably investigate the reason why Mr. Cook was wiring funds, usually in the amount of $49,500 to foreign accounts maintained at Standard Chartered and Bangkok Bank in, at least, seventy-four (74) successive transactions over a period of less than seven (7) months when he had no history of making these types of transactions, particularly when

taking in account the method of the transaction, the frequency of the transaction, the recipient of the transaction, and the amount of the transaction.

76. A simple inquiry regarding the addresses of the so-called banking locations and/or recipients to where the wire transfers were being delivered would have revealed that some of the locations were storefronts or back alleys and most likely fictitious. For example, the coversheet for the January 28, 2021 wire transfer reveals that the address of the person to whom the wire was directed was "165 alley behind the old Phraya Karai Temple Wat".

77. Most of the wire transfers were to different people, and were for almost the exact same amounts. Mr. Cook never produced any loan documents to any bank (and he was not asked), and what are the chances that an individual with as clean of a banking and creditor background as Mr. Cook had, would have over 74 individuals to whom he owed money, paid within seven (7) months.

78. It is also unclear that this time what information Wells Fargo had regarding the wire transfers it was processing for Mr. Cook in its role as intermediary bank for NFCU. Wells Fargo had reason to believe that Mr. Cook was a vulnerable person, and a victim of financial abuse and potentially could have prevented these transactions. It is unclear how they were not able to identify Mr. Cook as the maker of the wire transfers and stop them. Plaintiff subpoenaed documents related to the agreements between Wells Fargo and NFCU and did not receive any in response. Such information should be made available by NFCU and Wells Fargo during discovery in this case.

## COUNT I
## ASSUMPTION OF VOLUNTARY DUTY

79. Paragraphs 1-78 are incorporated herein as if fully restated.

80. Mr. Cook was a decorated veteran of the United States Navy.

81. NFCU serves members of the U.S. military, veterans, and their families, and

advertises itself as being a trusted financial institution for its members.

82. On December 12, 2020, NFCU undertook the duty to protect Mr. Cook due to the voluntary report made to Fairfax County Adult Protective Services by Mr. Robert Izzo, an NFCU representative as a result of the numerous suspicious international wire transfers ordered by Mr. Cook.

83. After the report to APS was made, NFCU failed to take the internal steps necessary to stop sending the wires out on Mr. Cook's behalf, which were inconsistent with his decades of banking behaviors.

84. Under Virginia common law, unless a duty is owed by contract, the general rule is that no such duty exists to report or prevent potential third-party criminal acts.

85. The exception to this rule is when a special relationship exists between the parties, and actual harm, which was reasonably foreseeable, occurred.

86. The Supreme Court of Virginia has widely held that a special relationship can be shown in the following two (2) circumstances: "(1) between the defendant and the third person which imposes a duty upon the defendant to control the third person's conduct, or (2) between the defendant and the plaintiff which gives a right to protection to the plaintiff." *Burns v. Gagnon*, 283 Va. 657, 669, 727 S.E.2d 634, 642 (2012).

87. In the present case before the Court, NFCU did not have a contractual obligation to report Mr. Cook to APS, but rather, by doing so, a special relationship was formed, and therefore a duty to act was required.

88. As such, under Virginia common law it has been widely viewed that when, "one who assumes to act, even though gratuitously, may thereby become subject to the duty of acting carefully, if he acts at all." *Terry v. Irish Fleet, Inc.,* 296 Va. 129, 136, 818 S.E.2d 788, 792 (2018).

89. Additionally, it is obvious that by virtue of the APS report, the concern was not only reasonably foreseeable, but the wire transfers were also, in fact, occurring and continued to occur even after the APS report was made.

90. Suggesting on the one hand that Mr. Cook appeared "competent" but then stating on the other that he is or may be the victim of a scam, is inconsistent.

91. Further, NFCU was alerted by APS by letter dated January 28, 2021, that Mr. Cook was in need of services, and that he was at risk of abuse, neglect or exploitation.

92. NFCU's voluntary assumption of duty imposed a burden on NFCU to protect Mr. Cook when it held itself out as an institution that would protect his interests, yet it failed to do so despite being aware that Mr. Cook was being harmed.

93. Every wire transfer made by Mr. Cook was a continuous breach of duty by NFCU. This conduct commenced on October 6, 2020 and only stopped on April 20, 2021, after seventy-four (74) wire transfers totaling over $3,633,050.00.

94. As a direct result of NFCU's failure to stop the international wires, Mr. Cook suffered damages of approximately three million six hundred and thirty-three thousand, and fifty dollars ($3,633,050.00). This amount represents the total amount transferred out ($3,631,200) plus, the NFCU fees of ($1,850.00).

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment against the Defendant Navy Federal Credit Union in the amount of three million six hundred and thirty-three thousand, and fifty dollars ($3,633,050.00) plus pre- and post-judgment interest, attorneys' fees and costs, and such further relief as this honorable Court deems appropriate.

## **COUNT II**
## **BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING**

95. Paragraphs 1-94 are incorporated herein as if fully restated.

96.     Mr. Cook, as an account holder, was in a contract with both NFCU and Wells Fargo for checking, banking, and savings account services, as embodied in NFCU's Deposit Agreement & Disclosures and Wells Fargo's Deposit Account Agreement.

97.     Under the Uniform Commercial Code ("UCC"), an implied covenant of good faith and fair dealing governs all contracts.

98.     This is specifically stated in Va. Code § 8.1A-304, which details the obligation of good faith: "Every contract or duty within the Uniform Commercial Code imposes an obligation of good faith in its performance and enforcement."

99.     Defendants breached the covenant of good faith and fair dealing when they failed to adequately investigate the suspicious transactions and transfers coming from Mr. Cook's accounts.

100.    By continuing to perform transactions after affirmatively stating that the transactions were part of a fraudulent scheme, Defendants acted in bad faith and with actual knowledge of the fraudulent scheme being perpetrated against Mr. Cook.

101.    Each of Defendants' actions was done intentionally, and in bad faith, as such, Defendants failed to adequately perform under the terms of the contracts made with Mr. Cook.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment against the Defendant Navy Federal Credit Union in the amount three million six hundred and thirty-three thousand, and fifty dollars ($3,633,050.00) plus pre- and post-judgment interest, attorneys fees and costs, and such further relief as this honorable Court deems appropriate and against the Defendant Wells Fargo, N.A. in the amount of forty five thousand five hundred dollars ($49,500.00), plus pre- and post-judgment interest, attorneys fees and costs, and such further relief as this honorable Court deems appropriate.

## COUNT IIII
## NEGLIGENCE/VOLUNTARY ASSUMPTION OF DUTY

102. Paragraphs 1 – 101 are incorporated herein as if fully restated.

103. NFCU, a federally regulated credit union, owed a duty of care to Mr. Cook, a longtime customer.

104. NFCU, as a financial institution, owed Mr. Cook a duty and/or voluntarily assumed a duty to act with ordinary and reasonable care.

105. In this context, ordinary and reasonable care by a financial institution includes protecting its customers from fraud.

106. As such, NFCU undertook the duty to reasonably protect its customer, Mr. Cook, from fraud; especially when the customer's accounts are displaying seriously irregular banking activity, including, but not limited to the wiring large amounts of funds, usually in the amount of $49,500, to Standard Chartered and Bangkok Bank seventy-four (74) times by a customer that has never engaged in numerous short term wire transactions of significant amounts of money before.

107. NFCU further breached its duty to Mr. Cook when it allowed him, a long-time and elderly customer of the bank, to wire a total of three million six hundred and thirty-one hundred thousand, and two hundred dollars ($3,631,200.00), in seventy-four (74) separate wire transfers to Standard Chartered and Bangkok Bank without meaningfully investigating and/or questioning the validity of the wire transfers.

108. NFCU negligently breached its duty of care to Mr. Cook by failing to decline, prevent, or otherwise stop the fraudulent transactions, especially after it notified Mr. Cook of the suspected fraud and when NFCU reported Mr. Cook's conduct to APS.

109. NFCU was negligent in failing to recall wire transfers after it became aware of the fraud being perpetrated against Mr. Cook.

110. As a direct result of NFCU negligence and failure to act, Mr. Cook was harmed in the amount of three million six hundred and thirty-three thousand, and fifty dollars ($3,633,050.00).

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment against the Defendant Navy Federal Credit Union in the amount of three million three million six hundred and thirty-three thousand, and fifty dollars ($3,633,050.00), plus pre- and post-judgment interest, attorneys fees and costs, and such further relief as this honorable Court deems appropriate.

**Respectfully submitted,**

**JANINE SATTERFIELD,** in Her capacity as Administrator for the Estate of Larry W. Cook,

**HALE BALL**
**Carlson Baumgartner Murphy, PLC**

  /s/Kimberley Ann Murphy_____
**KIMBERLEY ANN MURPHY, ESQ. (VSB No. 45691)**
kmurphy@haleball.com
**LISA M. CAMPO, ESQ. (VSB No. 85898)**
lcampo@haleball.com
**JUSTIN B. BERGER, ESQ. (VSB No. 87314)**
jberger@haleball.com  10511 Judicial Drive
Fairfax, Virginia 22030
Telephone: (703) 591-4900
Facsimile: (703) 591-5082
*Counsel for Plaintiff*

**CERTIFICATE OF SERVICE**

   I hereby certify that on this 31st day of January 2023, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following CM/ECF participants:


Mary C. Zinsner, Esq.
Troutman Pepper Hamilton Sanders LLP
401 9th Street NW, Suite 1000
Washington, DC 20004
Telephone: 202-274-1932
Facsimile: 703-448-6514
Email: mary.zinsner@troutman.com

David M. Gettings, Esq.
Troutman Pepper Hamilton Sanders LLP
222 Central Park Avenue, Suite 2000
Virginia Beach, VA 23462
Telephone: (757) 687-7500
Facsimile: (757) 687-7510
Email: david.gettings@troutman.com
*Counsel for Navy Federal Credit Union*


Heather B. Chaney, Esq.
MCGUIRE WOODS
1750 Tysons Boulevard, Suite 1800
Tysons, VA 22102
Tel: (703) 712-5015
Fax: (703) 712-5236
hchaney@mcguirewoods.com

*Counsel for Wells Fargo Bank, N.A.*


            /s/Kimberley Ann Murphy
             Kimberley Ann Murphy