**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| **IN RE: ESTATE OF LARRY W. COOK,** ) | |
|      **Deceased** ) | |
| _____ ) | |
| **JANINE SATTERFIELD, in Her Capacity** ) | |
| **as Administrator for the Estate of Larry W.** ) | **Case No. 1:23 – cv-000009 CMH/LRV** |
| **Cook, Deceased** ) | |
| ) | |
|      **Plaintiff,** ) | |
| ) | |
| **v.** ) | |
| ) | |
| **WELLS FARGO BANK, N.A.,** *et al.,* ) | |
| ) | |
|      **Defendants.** ) | |
| _____ ) | |

**PLAINTIFF'S OPPOSITION TO NAVY FEDERAL CREDIT UNION'S**
**MOTION TO DISMISS AMENDED COMPLAINT**

COMES NOW, Janine Satterfield, in Her Capacity as Administrator for the Estate of Larry W. Cook ("Plaintiff"), by counsel, and submits her opposition to the Motion to Dismiss the Amended Complaint filed by the Defendant, Navy Federal Credit Union ("NFCU").

**INTRODUCTION & FACTS AS ALLEGED IN THE AMENDED COMPLAINT**

Between October 6, 2020 and April 20, 2021, Larry W. Cook ("Larry"), a 76-year-old decorated United States Navy veteran, made seventy-four (74) international wire transfers at NFCU for a total amount of approximately $3,631,200.00 dollars to individuals maintaining accounts with the Bangkok Bank aka Bank of Bangkok and Standard Chartered. Larry retired from military service as a Commander in 1992, having served since 1968 and after receiving numerous medals and accolades. (*See* Am. Compl. at ¶¶ 13(a) and (d).) Larry never married, had no children, was preceded in death by his siblings and parents. (*See id.* at ¶¶ 24 and 25.) Prior to 2019, Larry was a meticulous record keeper, highly intelligent and managed his affairs, and that

of his mother's.  (*See id*. at ¶¶ 14, 18, 19 and 27.)  Tragically, that all changed on July 15, 2019 when Larry suffered an acute stroke.  (*See id*. at ¶ 28.)  He awoke at home with impaired coordination and failed to promptly seek medical attention for over fourteen hours that would have given him the opportunity to minimize his neurologic deficits.  (See *id*. at ¶ 29.)  Larry was discharged to in-patient rehabilitation where he was observed as having poor insight into his condition, lacking insight into his deficits, but was concerned about going back to work and being cleared to drive.  (*See id*. at ¶ 31.)  As a result of the stroke, Larry was left with left sided weakness, impaired sensation, "impaired coordination and unstable gait, facial droop and cognitive impairment including emotional lability, impulsiveness, impaired judgment, and impaired insight with denial, all making him highly vulnerable to undue influence and financial exploitation and impaired his capacity to make reasoned and rational judgments or decisions regarding his personal health and management of his finance."  (*Id*. at ¶ 32.)  By June 2020, Larry was forced to retire since he was no longer capable of working at the same level.  (*See id*. at ¶ 34.)  Following his stroke, Larry was not in the best of health, having suffered myocardial infarction, Type II Diabetes, Hypertension, Hyperlipidaemia, Gout, and Obesity.  (*See id*. at ¶ 41.)

On October 5, 2020, Larry received an unsolicited email from, what appeared, the company "Amazon".  (*See id*. at ¶ 42.)  Larry began falling for a very elaborate and fraudulent scam, the very scam that NFCU warned its customers about in a December 3, 2020 customer alert.  (*See id*. at ¶ 43.)  On October 6, 2020, Larry sent out, from his NFCU checking account, the first wire.  (*See id*. at ¶ 45.)  That same day, Larry contacted NFCU to check his account balance and stated, "We're moving money around due to an infraudulent [sic] charge on another system, and I need to validate what the current balance is."  (Id. at ¶ 46.)  On November 10, 2020, just five (5) days after a wire request was denied at Wells Fargo Bank, Larry was able to successfully send the same

wire, and sixty-one (61) additional wires, through NFCU.  (*See id*. at ¶ 57.)  On December 15, 2020, after twenty-eight (28) wires had been sent, Mr. Izzo, a representative of NFCU reported Larry to Fairfax County Adult Protective Services.  (*See id*. at ¶ 58.)  At no time, before, during or after making the APS report did NFCU stop wiring money out and continued sending documents to continue wire transfers.  (*See id*. at ¶¶ 66 and 67.)

Plain and simple, Larry was failed.  An entire system failed him.  This is a situation where the damages could have been mitigated – the significant fund outflow could have been, and by all indications, should have been mitigated, yet no one wants to take responsibility.  The number, frequency and dollar amounts involved was a drastic change in Larry's banking behavior and one of many, clear signs, showing that he was in need of assistance.  Larry was physically and cognitively impaired during this entire period of time and had fallen prey to a financial exploitation scheme.  This is a horrible case of financial exploitation, given the amount of money, and the sheer number of red flags present.

Despite suspecting that Larry was a vulnerable individual who was the victim of an ongoing financial crime, and despite reporting Larry's activity to Fairfax County Adult Protective Services ("APS"), and despite being told he was an adult in need of services, NFCU failed to take any steps to protect Larry and prevent him from further economic harm. The fraud against Larry only came to an end as a result of Larry's death on April 21, 2021.  It is sad that Larry's only repose from this scheme was death.

## STANDRARD OF REVIEW

A complaint need only contain "a short, plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). When evaluating a Rule 12(b)(6) motion to dismiss for failure to state a claim, a court must accept as true all well-pleaded allegations. *See*

*Vitol, S.A. v. Primerose Shipping Co.*, 708 F.3d 527, 539 (4th Cir. 2013); *see also Erickson v. Pardus*, 551 U.S. 89, 94 (2007).

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Making the plausibility determination is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. Ordinarily, a complaint should not be dismissed for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) unless it appears beyond all doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief. *Trulock v. Freeh*, 275 F.3d 391, 405 (4th Cir. 2001).

There are many, many facts alleged in the Complaint.  This is a seventeen page complaint, containing one hundred ten paragraphs and two hundred eighty four pages of exhibits.  There are no "bare assertions" or "legal conclusions".  Rather, there are enough facts contained in the Amended Complaint to state a claim to relief that is plausible on its face and to put the Defendants on notice of the action against them.

## ARGUMENT

### A.   Plaintiff's Common Law Claims are Valid, Despite U.C.C. Article 4A Governing Wire Transfers

The conduct alleged by the Plaintiff against NFCU is not confined to U.C.C. Article 4A, as codified in Virginia, because Plaintiff's allegations relate to NFCU's conduct prior to making the 74 wire transfers, not NFCU's conducted in executing the wire transfers. The cases cited by NFCU in Memorandum in Support of its Motion to Dismiss ("Memorandum") are cases in which a bank was alleged to have acted improperly during the act of the wire transfer itself.

*Peter E. Shapiro, P.A. v. Wells Fargo Bank, N.A.*, 795 F. App'x 741 (11th Cir. Nov. 27, 2019) differs from the facts at bar in this case on multiple levels. First, the lawsuit was brought against the bank which received the wire transfer, which was not the plaintiff's bank. That is not the case in the present case, where Larry was a customer and had an established and ongoing relationship with NFCU, the bank which sent the wire transfer. Second, the plaintiff argues that the bank which received the wire transfer was negligent for failing to detect that the name of the intended beneficiary did not match the name on the beneficiary account. This issue is not present in this case, as the Plaintiff has not alleged that NFCU erred in the wire transfer process itself.

The fact pattern in *Peter E. Shapiro, P.A* was intended to be governed by the U.C.C., as were the other cases cited in NFCU's Memorandum to support preemption, which also contain fact patterns that involve a dispute regarding the actual wire transfer itself. However, these disputes are entirely different than the dispute at bar in the present case; namely, whether a bank, already on notice that its customer is a victim of a fraud scheme and is mentally incapacitated, has a duty to protect its customer from further harm. The fact that the particular fraud scheme Larry was a victim of utilized wire transfers does not force this issue to be solely govern by U.C.C. Article 4A. The issue here is not whether NFCU properly executed the wire transfers in accordance with Article 4A and standard banking practices, but rather, what duty NFCU owed to Larry prior to issuing the wire transfer. This issue would be the same if the fraud scheme utilized checks, cash payments, or any other method of transferring money.

Contrary to NFCU's argument, Plaintiff's common law claims brought in the Amended Complaint are not displaced by the U.C.C. Even if U.C.C. Article 4A is applicable, which Plaintiff argues it is not, the application of the U.C.C. does not preclude the Plaintiff from bring an action against NFCU as a result of its negligence. "The Official Comment of Virginia Code Section 8.4A-

102 . . . sets forth that principles of law or equity may not be relied upon in order to create rights, duties, and liabilities which contradict those stated in Article 4A. The Comment, however, does not state the drafters intended to completely prohibit a party's reliance on law and equity claims. They merely meant to narrow and restrict their application." *AG4 Holding, LLC v. Regency Title & Escrow Servs.*, 98 Va. Cir. 89, 98 (Fairfax Cir. 2018). See also *First Georgia Bank v. Webster*, 168 Ga. App. 307, 308 (1983) (stating "As a general rule, [this means] that the UCC does not displace the common law of tort as it affects parties in their commercial dealings except insofar as reliance on the common law would thwart the purposes of the Code.") U.C.C. Article 4A does not displace common law causes of action in every instance where a wire transfer has occurred. NFCU's actions in allowing the wire transfers to occur, prior to the actual wire transfers were executed, are still subject to common law claims. "[T]he UCC does not displace all common law actions based on activities surrounding funds transfers." *Pedersen v. MidFirst Bank*, 527 F. Supp. 3d 188, 193 (N.D.N.Y. 2021) citing *Venture Gen. Agency, LLC*, 2019 U.S. Dist. LEXIS 129032, 2019 WL 3503109 at 4 (N.D. Cal. Aug. 1, 2019). NFCU cannot hide behind the U.C.C. for acts related to, but not part of, a wire transfer.

Therefore, this Court could find that U.C.C. Article 4A is applicable to this case while still allowing the Plaintiff to pursue common law claim for negligence based on NFCU's assumption of a duty.

NFCU's Memorandum relies extensively on *Napoli v. Scottrade, Inc.*, 2018 N.C. App. LEXIS 577 (N.C. Ct. App. June 5, 2018). *Napoli* considers similar facts to the present case and discusses U.C.C. Article 8.4A as applied to wire transfers, as enacted in North Carolina. Specifically, NFCU relies on the court's statement that U.C.C. Article 4A provides "the bright line rule that there must be an actual adjudication of incompetency for the bank to refuse a customer's

instructions," citing to the North Carolina statutory equivalent of Va. Code § 8.4-211(g). *Napoli*, 2018 N.C. App. LEXIS 577  at 9.  However, that bold statement by the North Carolina Court of Appeals does not comport with the plain language of U.C.C. Article 8.4A-211, either as adopted by North Carolina and quoted in *Napoli*, or as adopted in Virginia. Va. Code § 8.4A-211(g) states: "A  payment order *is not revoked* by the death or legal incapacity of the sender unless the receiving bank knows of the death or of an adjudication of incapacity by a court of competent jurisdiction and has reasonable opportunity to act before acceptance of the order." [Emphasis added]. A plain reading of Va. Code § 8.4A-211(g) demonstrates that the code section is only referring to situations where a wire transfer, after it has already been received, is subsequently revoked. That is not the same, nor is it the equivalent, of refusing to accept a payment order because a bank has a reasonable belief that its customer is incapacitated. The Amended Complaint alleges that NFCU had a duty to refuse Larry's repeated payment orders after it was clear to NFCU that Larry was incapacitated and the victim of a fraud scheme. NFCU's reliance on *Napoli* as a shield against liability is misplaced, as *Napoli* misstates the U.C.C. Article 8.4A-211(g) in equating revocation with refusal.

For that reason, Plaintiff's common law claims against NFCU should be allowed to proceed.

**B.     Plaintiff's Common Law Claims Do Not Fail as a Matter of Law.**

Plaintiff's common law claims do not fail as a matter of law.

**1.   Plaintiff's Claim for "Assumption of Voluntary Duty" Must Not Be Dismissed**

**a.   Virginia Law Does Recognize a Cause of Action for Assumption of Voluntary Duty**

Plaintiff's Amended Complaint alleges that NFCU had a duty to protect Larry when (1) Larry himself notified them of fraudulent activity involved in another account; (2) NFCU  assumed

that duty by filing a report with APS; and (3) being notified after the report that Larry was an adult in need of services. After all of that, NFCU had a duty to follow through with protecting Larry from further financial exploitation at NFCU, particularly since APS advised that he was an adult in need of services, and by that point, had already wired out over one million dollars.

The Supreme Court of Virginia has widely held that a special relationship can be shown in the following two (2) circumstances: "(1) between the defendant and the third person which imposes a duty upon the defendant to control the third person's conduct, or (2) between the defendant and the plaintiff which gives a right to protection to the plaintiff." *Burns v. Gagnon*, 283 Va. 657, 669, 727 S.E.2d 634, 642 (2012). Furthermore, the court in *Burns* found that when the issue involves a defendant assuming a duty, rather than the law recognizing a duty, the existence of the duty is a question for the fact finder. *Id*. at 672 citing *Kellerman v. McDonough*, 684 S.E.2d 786, 791-792. In addition, under Virginia common law it has been widely viewed that when, "one who assumes to act, even though gratuitously, may thereby become subject to the duty of acting carefully, if he acts at all", apply. *Terry v. Irish Fleet, Inc.,* 296 Va. 129, 136, 818 S.E.2d 788, 792 (2018).

As noted in a prior case heard in this Court involving a financial institution's duty to protect its customers' confidential information when it was on notice that the security of the information was vulnerable, while the assumption of duty caselaw in Virginia does not fit neatly within the fact pattern at issue in this case, "nothing in the cases that have applied the voluntary undertaking doctrine has expressly limited the doctrine only to wrongful death, wrongful birth, or certain driving related torts; and the Court concludes that if confronted with this case, the Supreme Court of Virginia would recognize an assumed duty, owed by Defendants to Plaintiffs." *In re Capital One Consumer Data Sec. Breach Litig.*, 488 F. Supp. 3d 374, 400 (E.D.V.A. 2020). The court

noted that the assumption of duty doctrine in Virginia consistent with the doctrine as articulated in

§ 323 *of the Restatement (Second) of Torts*.

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
>
> (a) his failure to exercise reasonable care increases the risk of such harm, or
>
> (b) he has undertaken to perform a duty owed by the other to the third person, or
>
> (c) the harm is suffered because of reliance of the other or the third person upon the undertaking

In *In re Capital One Consumer Data*, the Court allowed the case to proceed on the voluntary assumption of duty grounds because the defendants represented that they had the ability to protect customer confidential information. 488 F. Supp. 3d 374, 400-401. As a result, the defendant had voluntarily assumed a duty within the Restatement and established Virginia law and were required to exercise reasonable care.

As mentioned above, Larry was a decorated veteran of the United States Navy. NFCU serves members of the U.S. military, veterans, and their families, and it advertises itself as being a trusted financial institution for its members. Therefore, it is quite reasonable for Larry to have believe that NFCU would look out for his interests when the time arose, as opposed to other financial institutions which did not advertise such a mission. Therefore, NFCU's advertisements of serving military members, plus in reporting Larry to APS shows a voluntary assumption of duty which NFCU later breach when it negligently failed to stop the wire transfers when it was clear that Larry was incapacitated and a victim of a fraud scheme.

Furthermore, NFCU oversimplifies Plaintiff's argument in claiming that a single line in APS's January 28, 2021 letter stating Larry needed protective services should have forced NFCU into action to stop the wire transfer. While that letter put NFCU on further notice that Larry needed

assistance, NFCU was already on notice, as demonstrated by the fact that it reported Larry to APS in the first place. NFCU's failure to act when it was aware Larry's banking behavior has drastically changed over short period of time, it already suspected Larry was a victim of fraud or otherwise in need of protection, and it had been told Larry needed protective services is negligence.

In *Hawkins v. Bank of America*, cited by NFCU, it was found that, "there are circumstances when banks have a duty of care. Banks "ha[ve] a duty to act with reasonable care in [their] transactions with depositors;" this duty is "an implied term in the contract between the bank and its depositor." 2018 U.S. Dist. LEXIS 42197, at *7 (S.D. Cal. Mar. 14, 2018) [citations omitted]. The court went on to find that the bank owed its customer an "implied duty to act with reasonable care in its transactions" and that "[a] duty of care may also arise when individual notifies a bank of potential fraud occurring with respect to bank accounts." *Id*. NFCU knew Larry was a victim of fraud, and thus, owed him a duty of care to take the appropriate actions to prevent further harm from occurring. This is akin to the obligation a bank would have if it knew its customer was committing a crime and allowed it to continue. *See Falk v. N. Trust Co.*, 327 Ill. App. 3d 101 (Ill. App. 2001) (finding a possibility of bad faith by a bank where it was alleged that the bank was on notice that the wrongdoer was breaching her fiduciary duties, and given the numbers of years and the amount of transactions alleged by the plaintiff.)

The fact that NFCU and Larry had a contractual relationship does not relieve NFCU from liability for acting negligently in protecting Larry.  It is also worth mentioning that NFCU, as with other banks, has obligations under the Bank Secrecy Act (31 U.S.C. § 5311 *et seq*.).  The U.S. Department of the Treasury Financial Crimes Enforcement Network and Consumer Financial Protection Bureau have released various memoranda notifying financial institutions about elder financial exploitation.  In fact, they issue "best practices" in order "to assist financial institutions

with their efforts to prevent elder financial abuse and intervene effectively when it occurs." *Recommendations and Report for Financial Institutions on Preventing and Responding to Financial Exploitation*, March 2016, Consumer Financial Protection Bureau at 2 (attached hereto as **<u>Appendix A</u>**).

There are reporting requirements which are part of the BSA, to include mandatory reporting if the financial institution knows, suspects, or has reason to suspect that a transaction has no lawful purpose or is inconsistent with that customer's usual banking activity, and the financial institution knows of no reasonable explanation for the transaction. *See id*. at 26-26. NFCU processed seventy four (74) wire transfers, most purporting to "loan repayments".

A simple inquiry regarding the addresses of the so-called banking locations and/or recipients to where the wire transfers were being delivered would have revealed that some of the locations were storefronts or back alleys and most likely fictitious. For example, the coversheet for the January 28, 2021 wire transfer reveals that the address of the person to whom the wire was directed was "165 alley behind the old Phraya Karai Temple Wat".

Most of the wire transfers were to different people, and were for almost the exact same amounts. Larry never produced any loan documents to any bank (and he was not asked), and what are the chances that an individual with as clean of a banking and creditor background as Larry had, would have over 74 individuals to whom he owed money, paid within seven (7) months.

Finally, other banks employ what can only be described as "industry standards" prior to the processing of each wire. Some of that relevant information is having evidence of the transaction. See Key Bank wire transfer checklist attached as **<u>Appendix B</u>**.

There was more than enough suspicious activity there, but NFCU took an extra step – NFCU reported the situation to APS. Larry's health and mental condition certainly made him

vulnerable.  But, what is the point of reporting if nothing is done?  NFCU was within its rights (and would be consistent with industry standard) to decline transmitting the wires, and upon receiving the APS letter on January 28, 2021 being advised that Larry was in need of services – what did NFCU do at that point?  Nothing.  The problem is that one cannot assume the duty and then walk away.

As discussed above, NFCU's voluntary assumption of duty imposed a burden on NFCU to protect Larry when it held itself out as an institution that would protect Larry's interests, yet it failed to do so despite being aware that Larry was being harmed.  They were put on notice in October 2020 that Larry had a compromised account.  They processed significant sums of money. They reported the situation to APS.  They received a response.  They should have done more. Where was the training NFCU employees should have had?  Where are the Suspicious Activity Reports? These funds went to a foreign country, unchecked.  The CFPB makes it clear that banks are not just supposed to sit on the side lines, and surely, NFCU could have done something other than watch millions leave Larry's accounts.

NFCU voluntarily assumed a duty to protect Larry and they failed to follow through with their obligation. Despite suspecting, and confirming, that Larry needed protective services, NFCU negligent allowed Larry to make seventy-four (74) wire transfers to foreign banks. Therefore, NFCU's Motion to Dismiss Counts I and III should be denied.

### b.  Federal and State Statutes Do Not Shield NFCU from Liability

NFCU is incorrect that it is shielded from liability for failing to prevent the relevant transactions because that federal and state statutes provide immunity for reporting possible violations of elder abuse to the relevant authorities. The statutes cited by NFCU are designed to shield financial institutions from liability from their customers if they the financial institutions

reports suspected elder abuse and disclose confidential customer information in the process. The *Senior Safe Act* states that "An individual who has received the training described in subsection (b) shall not be liable, including in any civil or administrative proceeding, for disclosing the suspected exploitation of a senior citizen to a covered agency if the individual, at the time of the disclosure." 12 U.S.C. § 3423(2)(A). Furthermore, "A covered financial institution shall not be liable, including in any civil or administrative proceeding, for a disclosure made by an individual described in subparagraph (A). 12 U.S.C. § 3423(2)(B). Furthermore, the Senior Safe Act Fact Sheet issued on May 23, 2019 by the North American Securities Administrators Association (NASAA), the United States Securities and Exchange Commission, and FINRA state that "the Senior Safe Act provides immunity from liability in any civil or administrative proceeding for reporting potential exploitation of a senior citizen. As an example, this immunity can be helpful when a firm wants to report potential exploitation but fears that the report could violate a privacy requirement." (attached hereto as **Appendix C**).

Similarly, 31 U.S.C. § 5318(g)(3)(A) shields a financial institution from liability for reporting violations of law "for such disclosure or for any failure to provide notice of such disclosure to the person who is the subject of such disclosure, or any other person identified in the disclosure." The Amended Complaint does not seek to impose liability for reporting Larry to APS; for disclosing personal information of Larry or otherwise. Rather, the Amended Complaint seeks damages for NFCU's failure to protect Larry after assumed a duty to protect Larry by notifying APS of potential elder abuse, and after NFCU was on notice that Larry was impaired, and that Larry needed protection.

Virginia Code § 63.2-1606(E) does offer protections to financial institutions when they report financial exploitation. However, the protection relates to the reporting itself, not the actions

it takes, or does not take, after  it has reported the exploitation.  Virginia Code § 63.2-1606(E)

states that "Any person who makes a report or provides records or information . . . shall be immune

from any civil or criminal liability on account of such report, records, information, photographs,

video recordings, appropriate medical imaging or testimony, unless such person acted in bad faith

or with a malicious purpose." As with the federal statutes cited in NFCU's Motion to Dismiss,

Virginia Code § 63.2-1606 is not designed to allow a financial institution to be shielded from all

liability when it reports a customer who may be financially exploited; it is designed to protect them

from liability for the act, itself, of reporting the customer.

In addition, Va. Code Ann. § 63.2-1606(L), Protection of Aged or Incapacitated Adults,

provides protection to banks and financial institutions for *refusing to make transactions* when the

bank essentially shuts down an account for suspect activity. This law comes on the heels of the

Bank Secrecy Act, to entice financial institutions to report, and refuse, suspicious activity. This is

the opposite of what occurred in the present case.[1]   NFCU had all the tools at its disposal, and it

---

[1] Va. Code Ann. § 63.2-1606(L) states: "Financial institution staff may refuse to execute a transaction, may delay a transaction, or may refuse to disburse funds if the financial institution staff (i) believes in good faith that the transaction or disbursement may involve, facilitate, result in, or contribute to the financial exploitation of an adult or (ii) makes, or has actual knowledge that another person has made, a report to the local department or adult protective services hotline stating a good faith belief that the transaction or disbursement may involve, facilitate, result in, or contribute to the financial exploitation of an adult. The financial institution staff may continue to refuse to execute a transaction, delay a transaction, or refuse to disburse funds for a period no longer than 30 business days after the date upon which such transaction or disbursement was initially requested based on a good faith belief that the transaction or disbursement may involve, facilitate, result in, or contribute to the financial exploitation of an adult, unless otherwise ordered by a court of competent jurisdiction. Upon refusing to execute a transaction, delaying a transaction, or refusing to disburse funds, the financial institution shall report such refusal or delay within five business days to the local department or the adult protective services hotline. Upon request, and to the extent permitted by state and federal law, financial institution staff may report any information or records relevant to a report or investigation to the local department of social services or to a court-appointed guardian ad litem for the adult who is the subject of the investigation. Absent gross negligence or willful misconduct, the financial institution and its staff shall be immune from civil or criminal liability for (a) providing information or records to the local department of social

stood by and watched what happened to this poor, elderly man.  NFCU had ample reason to believe something nefarious was going on.  Larry was socially isolated.  Larry never exhibited this banking behavior before.  NFCU was told he needed services.  Larry told NFCU that another account of his was compromised in October 2020.  The pieces to the puzzle were all there.  NFCU could have and should have acted.

Furthermore, Plaintiff has not pled, nor is she attempting, to enforce a private cause of action under the *Senior Safe Act*, *Bank Secrecy Act*, or Virginia Code § 63.2-1606. Plaintiff has not filed action against NFCU for sharing Larry's confidential information with the authorities when NFCU suspected Larry was a victim of financial exploitation. The gravamen of this case against NFCU is that they, NFCU, failed to take the proper steps to prevent Larry, an incapacitated person, from being exploited when NFCU had raised their own suspicions that Larry was a victim of financial exploitation, was told he was in need of services, and did nothing but stand by and watch millions of dollars leave his account (the purpose of which could have been the potential funding of terrorism, which is exactly why scrutiny is the legal and industry standard).  NFCU could have acted without liability by simply refusing to send the wires, for any number of reasons that lay before it.  NFCU chose not to do so.

**C.     The Economic Loss and Source of Duty Rules Do Not Bar Plaintiff's Tort Claims**

NFCU's undertaking to report Larry to APS was not derived from the contractual relationship between the parties. However, once NFCU made the report, it was required to follow

---

services or to a court-appointed guardian ad litem or (b) refusing to execute a transaction, delaying a transaction, or refusing to disburse funds pursuant to this subsection. The authority of a financial institution staff to refuse to execute a transaction, to delay a transaction, or to refuse to disburse funds pursuant to this subsection shall not be contingent upon whether financial institution staff has reported suspected financial exploitation of the adult pursuant to subsection C.

through and offer additional protections to Larry. The economic loss rule does not prevent recovery for NFCU's negligence in allowing the wire transfer to continue, especially after NFCU reported Larry to APS and NFCU received the results of that investigation. The harm is rooted in negligence, not in breach of contract. Furthermore, similar to the plaintiffs in *In re Capital One Consumer Data Sec. Breach Litig.*, Plaintiff has alleged facts which makes plausible negligent claims under Virginia law which would not be barred under the economic loss rule.

As such, NFCU's Motion to Dismiss should not be granted on the theory of the economic loss rule.

### D.    Plaintiff's Inability to Produce a Contract and Point to Specific Clauses is a Result of NFCU's Behavior

NFCU argues that Count II should be dismissed because Plaintiff cannot allege a breach of the covenant of good faith and fair dealing with explicitly pointing to terms of the contract. However, Plaintiff's inability to cite to specific contract clauses is a direct result of NFCU's conduct. After Plaintiff qualified as administrator of Larry's Estate she requested, and received expanded powers to issue subpoenas. Plaintiff subpoenaed various entities, including NFCU. True copies of subpoena's issued on behalf of Plaintiff to NFCU are attached hereto as **<u>Exhibit 1</u>**. NFCU was deficient in its responses and failed to provide any contractual agreements between NFCU and Larry.  However, such agreements must assuredly exist, as evidenced by NFCU's claim in its Motion to Dismiss that the relationship between NFCU and Larry was contractual.

As a result of NFCU's failure to respond to Plaintiff's subpoena, it is unclear what contractual obligations NFCU had to Larry, and whether or not NFCU was in fact obligated to accept any payment order submitted by Larry or what other duties NFCU had towards Larry. NFCU may have been empowered with the discretion to act in a manner contrary to Larry's

demands if NFCU did not believe it to be in Larry's best interests. Therefore, to the extent that Va. Code § 8.4A-212 shields NFCU from any liability for its failure to prevent Larry from making the wire transfers, NFCU should not be able to hide from liability based on its contract with Larry, as a result of its failure to produce a contract in response to Plaintiff's subpoenas.

Therefore, before Plaintiff's claim against NFCU for breach of the covenant of good faith and fair dealing is dismissed, and before NFCU can shield itself from liability under the guise of U.C.C. Article 4A, Plaintiff should be afforded a chance to actual receive the documents she has requested from NFCU to determine the sufficiency of her claim in Count II.

E.    **NFCU is Jointly and Severally Liable with Wells Fargo for Aiding and Abetting the Fraudulent Transaction**

NFCU was aware that Larry lacked capacity and was the subject of a fraud scheme as demonstrated by NFCU reporting Larry to APS as a result of his repeated wire transfer requests that were suspicious in nature. Yet, despite having direct knowledge of Larry's circumstances, NFCU processed over seventy wire transfers for Larry. The fact that NFCU reported Larry to APS precludes NFCU from pleading ignorance; NFCU was on notice that Larry was incapacitated, a victim of fraud, or both.  "[T]he common law of the Commonwealth has looked with favor upon recovery in tort against those who aid and abet others in the commission of the civil wrong for which damages may be maintained." *Sherry Wilson & Co. v. Generals Court, L.C.*, 2002 Va. Cir. LEXIS at 3, 2002 WL 32136374 (Loudoun Cty. Sept. 27, 2002). To maintain an action for aiding and abetting a fraud, it must be shown that a fraud was committed, and "that there was knowledge of this fraud on the part of the aider and abettor, and substantial assistance by the aider and abettor in the achievement of the fraud, and that damages to the plaintiff were proximately caused thereby." *Id*. NFCU was aware and on notice of the fraud

being perpetrated against Larry and, along with Wells Fargo, allowed the fraud to continue to occur to the detriment of Larry.

**F.      Plaintiff's Claims are Not Barred by the Applicable Statute of Limitations**

Plaintiff's claims, including those regarding transfer prior to November 4, 2020 are not barred by the statute of limitations. Virginia Code § 8.01-229(b) tolls the statute of limitations while Larry was incapacitated[2], which he was during all times relevant.

Furthermore, all of the wire transfers made by Larry at Navy Federal Credit Union are

---

[2] An "incapacitated person" is defined as "[a] person who is impaired…by mental illness or deficiency, or by physical illness or disability to the extent that personal decision-making is impossible." *Black's Law Dictionary*, 346 (3rd pocket ed. 2006). Furthermore:

> … capacity encompasses two concepts - functional capacity and decision-making capacity. Functional capacity relates to a person's ability to take care of oneself and one's property. Decision-making capacity relates to one's ability to make and communicate decisions with regard to caring for oneself and one's property. The distinction between cognitive capacity and competence in actual performance is somewhat artificial because functional capacity depends, in part, on decision-making capacity. . .

> Functional capacity to care for property involves a person's ability to manage personal property, real property, and finances. Because a person's ability to manage property depends on the size, type, and complexity of the person's holdings, the first step in the inquiry must be to identify the property that the person owns or controls. The focus of an inquiry into a person's functional capacity to manage property is on whether a person's functional inability to make or communicate decisions regarding the acquisition, administration, or disposition of his or her property may lead to the waste or dissipation of the property…

> Persons frequently display different levels of decision-making ability. A person may be simultaneously capable and incapable with respect to different types of decisions. Courts routinely apply different standards for determining capacity depending on the nature of the decision or action involved. Accordingly, capacity should be determined on a decision-specific basis.

*In re Conservatorship Groves*, 109 S.W.3d 317, 328-36 (Tenn. Ct. App. 2003).

governed by the continuing tort doctrine. "When negligent or tortious conduct is continuous, the cause of action does not accrue until that conduct has ceased. *Williams v. Norfolk & W. Ry. Co., 530 F.2d 539,542, (4th Cir. 1975)* (pattern of employment discrimination was a continuing tort); *City of Richmond v. James, 170 Va. 553, 567, 197 S.E. 416, 421* (1938) (continued emission of gas through uncapped pipe was continuing negligence). However, there is a distinction between continued tortious behavior and continued harm resulting from a single tortious act, to which the statute of limitations will attach at the time of injury. See *Churchill Apartments Assocs. v. City of Richmond, 36 Va. Cir. 204, 206-207 (City of Richmond 1995)* (cause of action accrued when landfill was improperly capped, even though resulting generation of methane gas was continuous).

In this case, every wire transfer made by Larry was a continuous breach of duty by NFCU. This conduct commenced on October 6, 2020 and only stopped on April 20, 2021, after seventy-four (74) wire transfers totaling over $3.6 million. The allowance of any single wire transfer may not necessarily qualify as a negligent act. However, when taken as a whole, it is clear that a pattern of fraud and abuse was occurring. As a result, the limitations period did not start to run until April 20, 2021 when Larry made his last wire transfer with NFCU. Even without tolling the limitations period for the time Larry was incapacitated, the Amended Complaint was filed before the expiration of the two (2) year limitations period of Virginia Code § 8.01-243 or Virginia Code § 8.01-228.

NFCU's Memorandum quotes from Virginia Code § 8.01-229(A)(2)(b) to demonstrate that the statute of limitations did not toll with respect to Larry's incapacity. NFCU states, "For the purposes of subdivisions 1 and 2, a person shall be deemed incapacitated if he is so adjudged by a court of competent jurisdiction". NFCU Memo. Mtn. Dismiss. at 24. It is true that Larry was never

adjudged to be incompetent by a court during his lifetime. However, that is only a partial quotation of the cited code section. The full second paragraph in Virginia Code § 8.01-229(A)(2)(b) states:

> For the purposes of subdivisions 1 and 2, a person shall be deemed incapacitated if he is so adjudged by a court of competent jurisdiction, ***or if it shall otherwise appear to the court or jury determining the issue that such person is or was incapacitated within the prescribed limitation period.***

[Emphasis added.]  The trier of fact in this case could determine that Larry was incapacitated during the relevant times of this case based on the evidence presented by Plaintiff to that effect. NFCU cannot definitively assert that Larry was not incapacitated when he ordered the wire transfers, nor can NFCU assert that this Court will not determine that Larry was incapacitated when he ordered the wire transfers.  At this stage in the proceedings, it is too early to determine whether or not the statute of limitations tolled and, as a result, it is too early to preclude any of Plaintiff's claims based on the running of the statute of limitations.

## CONCLUSION

For the reason stated above, Navy Federal Credit Union's Motion to Dismiss the Amended Complaint should be denied, or in the alternative, Plaintiff should be permitted the opportunity to further amend her Amended Complaint.

Respectfully submitted,

**JANINE SATTERFIELD, in Her Capacity as Administrator for the Estate of Larry W. Cook,**
By Counsel

**HALE BALL**
**Carlson Baumgartner Murphy, PLC**


 /s/Kimberley Ann Murphy
**KIMBERLEY ANN MURPHY, ESQ. (VSB No. 45961)**
kmurphy@haleball.com
**LISA M. CAMPO, ESQ. (VSB No. 85898)**
lcampo@haleball.com
**JUSTIN B. BERGER, ESQ. (VSB No. 87314)**
jberger@haleball.com
10511 Judicial Drive
Fairfax, Virginia 22030
Telephone: (703) 591-4900
Facsimile: (703) 591-5082
*Counsel for Plaintiff*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this 28th day of February 2023, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following CM/ECF participants:

Mary C. Zinsner, Esq.
Troutman Pepper Hamilton Sanders LLP
401 9th Street NW, Suite 1000
Washington, DC 20004
Telephone: 202-274-1932
Facsimile: 703-448-6514
Email: mary.zinsner@troutman.com

David M. Gettings, Esq.
Troutman Pepper Hamilton Sanders LLP
222 Central Park Avenue, Suite 2000
Virginia Beach, VA 23462
Telephone: (757) 687-7500
Facsimile: (757) 687-7510
Email: david.gettings@troutman.com
*Counsel for Navy Federal Credit Union*

Heather B. Chaney, Esq.
MCGUIRE WOODS
1750 Tysons Boulevard, Suite 1800
Tysons, VA 22102
Tel: (703) 712-5015
Fax: (703) 712-5236
hchaney@mcguirewoods.com

*Counsel for Wells Fargo & Company*

_/s/Kimberley Ann Murphy_____
Kimberley Ann Murphy